```
 1              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
 2                     IN SEATTLE

 3   ------------------------------------------------------------

 4   ANGELO DENNINGS, et al.,        )
                                     )
 5            Plaintiffs,            )   No. C10-1859JLR
                                     )
 6      v.                           )
                                     )
 7   CLEARWIRE CORPORATION,          )
                                     )
 8            Defendant.             )

 9
     ------------------------------------------------------------
10
                    SHOW CAUSE HEARING
11
     ------------------------------------------------------------
12
                    August 20, 2013
13

14         BEFORE THE HONORABLE JAMES L. ROBART
            UNITED STATES DISTRICT COURT JUDGE
15

16

17

18   APPEARANCES:

19   For the Plaintiffs:        Clifford Cantor
                                LAW OFFICE OF CLIFFORD CANTOR
20                              Felix Luna
                                PETERSON WAMPOLD ROSATO LUNA
21                              KNOPP

22   For the Defendant:         Steve Rummage
                                DAVIS WRIGHT TREMAINE
23
     For Mr. Bandas:            Michael Iaria
24                              Susan Wilk
                                Donald Heyrich
25                              LAW OFFICE OF MICHAEL IARIA
```

1          THE COURT:  The clerk will call this matter.

2          THE CLERK:  Case C10-1859, Angelo Dennings versus

3   Clearwire Corporation.  Counsel, please make your

4   appearances for the record.

5          MR. CANTOR:  Good afternoon, your Honor.  Cliff

6   Cantor for the plaintiffs.

7          MR. LUNA:  Good afternoon, your Honor.  Felix Luna

8   for the plaintiff.

9          MR. RUMMAGE:  Steve Rummage, your Honor, for the

10  defendants.

11         MR. IARIA:  Mike Iaria for Mr. Bandas personally.

12  Also present is Susan Wilk.

13         MS. WILK:  Good afternoon.

14         MR. BANDAS:  Your Honor, Chris Bandas for

15  objectors.

16         MR. HEYRICH:  Donald Heyrich.  Good afternoon.

17         THE COURT:  Counsel, we are here for further

18  hearing in regards to the question which the court had

19  raised in regards to what is the appropriate sanction, if

20  any, in regards to the failure to comply with the orders

21  of this court.

22     In connection with that, I can tell you that I have

23  reviewed the memorandum submitted by Mr. Bandas, and

24  attached to that the exhibits, which include the

25  declaration from Mr. Talmadge, the declaration from

1   Mr. Kagan, the declaration of -- I assume it is probably a

2   she -- Jan Petrus, and, finally, the declaration of

3   Mr. Bandas, which contains a number of additional

4   attachments, and then some cases cited for the benefit of

5   the court, including the Navistar Diesel Engine Products

6   Liability Litigation, and a copy of a pleading filed in

7   this matter, only in the Ninth Circuit.

8       In addition to that, I have had the opportunity to

9   conduct some extensive research into the defendant's --

10  excuse me, Mr. Bandas' principal objection to any form of

11  sanctions, which is the question of bad faith.  I think

12  that I, at this point, am quite up to speed on what

13  appropriately should be done here.

14      So, Mr. Iaria, do you wish to present any other

15  evidence before I hear argument?

16          MR. IARIA:  I am not prepared to present

17  additional evidence at this hearing.  I was under the

18  impression that evidence would be limited to a written

19  submission that was due last week.  That's what we have

20  done.

21          THE COURT:  Is this intentional that you set a

22  date, you move the date, and now you tell me that you are

23  not going to present evidence?  You, sir, are the one who

24  raised the question last time of we are going to be denied

25  our constitutional due process if I'm not permitted to

 1   present evidence.

 2          MR. IARIA:  I apologize, your Honor.  I believe

 3   the court indicated that we had the right to do it at the

 4   first part of the hearing, and then subsequent to that

 5   there would be written submissions.  That's what we

 6   focused on doing.

 7          THE COURT:  Then I am cancelling today's hearing.

 8   I am going to set a new date.  I will set it at the

 9   convenience of the court.  If you want to call witnesses,

10   you can call witnesses.  But, frankly, I consider this to

11   be game playing --

12          MR. IARIA:  Your Honor --

13          THE COURT:  And I don't understand why you are

14   doing this.  But that's your decision.

15      The clerk will issue a new hearing date.  I expect it

16   to be held promptly, and I will take action at that time.

17   If you're going to call witnesses, you need to have them

18   here, in addition to the written material that you have

19   submitted.

20          MR. IARIA:  Your Honor, may I address the court,

21   please?

22          THE COURT:  Yes, please do.

23          MR. IARIA:  I have had the opportunity to discuss

24   with my client on what the preferred method of proceeding

25   is.  I am not playing games.  That was my understanding of

```
 1    what the court's order was, that this part of the

 2    proceeding we were limited to submitting written

 3    submissions, and that's what we did, your Honor.  I am not

 4    playing games, your Honor.  I understand the court.  I

 5    understand your position.  I don't do that.  And I'm not

 6    doing this in this manner.  I just don't do that.

 7              THE COURT:  It is your turn to talk.  Go ahead.

 8              MR. IARIA:  I'm done.  I have expressed --

 9              THE COURT:  Did you contact the court and say you

10    wanted to present live evidence at any time?

11              MR. IARIA:  The motion to continue indicated the

12    due process rights to present evidence, and the court

13    responded -- it is my interpretation of the court's

14    response, in its response to our motion to continue, and

15    the last portion of this hearing, this continued portion

16    of the hearing would be limited to a submission in

17    writing.

18              THE COURT:  All right.  It is your client's

19    jeopardy, counsel.  I don't know why you are playing fast

20    and loose with the rules, because it is his reputation and

21    it is his ability to practice.  But we brought him up here

22    so that we would get a final resolution of this on the

23    schedule that you urged, after you said you couldn't

24    possibly have it done, and then you shortened your own

25    schedule.  Now you are telling me it needs to be extended
```

```
 1    to some date in the future because you are not prepared to
 2    call live witnesses.  If you wish to consult with your
 3    client, go ahead and consult with your client.
 4         MR. IARIA:  I didn't think the court wanted to
 5    hear live witnesses at this hearing, and was limiting it
 6    to written submissions.  I am telling you that as honestly
 7    and directly as I can.  I do not play games with things
 8    like that.  I just don't.  I am not going to play games
 9    with your Honor.  I wouldn't play games of any sort with
10    the court in a matter like this.  I wouldn't take his
11    reputation in my hands like that and cast it aside
12    lightly.  I am just not playing games.  I don't know what
13    else to say.
14         THE COURT:  Well, if you wished to call witnesses,
15    telling me that you somehow thought you were foreclosed, I
16    would have anticipated, before we brought your client up
17    here again, that you would indicate that you want to call
18    live witnesses, and that this date wasn't convenient for
19    them, or you didn't have time to arrange them, whatever
20    reason.  I haven't heard any of that.  What I have heard
21    was, we will submit materials, which came in.  Now,
22    frankly, I am shocked to come out here and be told, "I'm
23    not prepared to proceed with this hearing."
24         MR. IARIA:  May I have a second, your Honor?
25         THE COURT:  Please don't tell me to hold on a
```

1   second.  I think I am in control of this courtroom,

2   counsel.  Now, if you want to talk to your client or you

3   want to get notes from counsel, that's fine.

4            MS. WILK:  May I approach, your Honor?

5            THE COURT:  Yes, you can.

6            MR. IARIA:  Your Honor, we are prepared to go

7   forward today on the basis of the written submissions.

8            THE COURT:  I'm not prepared to accept that.  I am

9   not going to have you going up to the Court of Appeals

10  saying, "I was denied the opportunity to present a full

11  and fair defense."  Therefore, I am going to adjourn this

12  hearing.  I am going to set a new date.  You can call your

13  live witnesses at that time.  But I am not going to leave

14  you that very substantial opening to drive through and

15  say, the court was unfair to me.  That's where we are.

16    Let me make it clear.  I can't control what Mr. Bandas

17  does anywhere except in the Western District of

18  Washington.  He is admitted under a process by the clerk's

19  office, where there is absolutely no review, other than

20  him filling out some document that says I am in good

21  standing and I have not been disciplined.

22    We are here, in part, because if I find that there has

23  been a willful disregard of an order of this court, one of

24  the remedies that is available to me is to cancel that

25  ad hoc admission to practice.  That's a serious matter

1    only to the extent that it appears on your disciplinary

2    record.  I don't want to do that on less than a full

3    record.  If you think you need live witnesses, then we are

4    going to have live witnesses.

5      I will order up the transcript.  If I said, "no live

6    witnesses" last time, then I will apologize.  But I

7    thought that we had a clear understanding that we were

8    setting this hearing so you have a full and fair

9    opportunity to confront the questions that the court has

10   and proceed to make the record you want to make.

11      You have submitted two inches' worth of briefing, and

12   I appreciate that.  I found it very interesting.  I don't

13   think you are right on the law, but I will tell you that

14   it is a fairly murky area on the question of intent.  I

15   was looking forward to argument.  If you want to call

16   witnesses, great, you can call witnesses.  Everyone else

17   can sit down, because there is only one person that speaks

18   at a time.

19        MR. IARIA:  With the court's permission, may I at

20   least discuss directly with Mr. Bandas whether he is

21   prepared to go forward on the basis of the written

22   submissions alone today, rather than resetting?

23        THE COURT:  Counsel, however, that doesn't prevent

24   you from then saying, we wanted to call witnesses; we were

25   placed in this position; the court maneuvered into it.

1    Frankly, that is what I am trying to avoid.  I will give

2    you that full and fair opportunity.

3            MR. IARIA:  It would address that if we say it

4    does on the record.  It is one of those things I would

5    prefer to talk to my client directly about for a minute or

6    two and tell the court what our position is.  The court

7    can have certainty about the record if we are going to

8    proceed today.

9            THE COURT:  When you go up to the Ninth Circuit

10   and you say, "We didn't know we were able to call

11   witnesses," and "the court wanted to proceed with the

12   hearing," and so "we were maneuvered into the position of

13   being denied that opportunity even though we consented to

14   it," that's what I am concerned about.  But, please, talk

15   to your client.

16           MR. IARIA:  Thank you.

17   (At this time a short pause in the proceedings.)

18           MR. IARIA:  I have discussed the specific issue

19   the court has raised with Mr. Bandas.  He is prepared to

20   go forward today on the basis of the written submissions.

21   He is willing to waive any argument on appeal that deals

22   with the inability, for want of a better term, or the

23   failure to present live testimony here today.  We

24   understand completely that the court has given us the

25   opportunity to come back another time and present live

1   testimony.  Mr. Bandas would engage in a colloquy with the

2   court, to the extent the court wants to satisfy itself

3   that this waiver is knowing and voluntary, and complies

4   with all aspects of due process.  I would point out that

5   there are waivers of this type entered all the time in

6   many different cases and witnesses.

7       Again, I can't say enough that I did not do this as a

8   machination or a way to create an issue.  We are not

9   trying to create one now.  If the court wants to talk to

10  Mr. Bandas, I would like the court to do that.

11              THE COURT:  Counsel, I will engage with you

12  because you are counsel of record.  Please proceed with

13  your argument.

14              MR. IARIA:  May it please the court, I have

15  concerns today, and they are concerns based on the nature

16  of inherent sanctions and the authority that they give the

17  court.

18      As expressed in Hanshaw Enterprises, the court becomes

19  essentially an accuser, a fact-finder and a sentencing

20  judge.  This obviously creates some troublesome potential,

21  as Hanshaw recognized.  It can also lead to a lawyer

22  acting on behalf of a client, not being precisely sure who

23  he or she is talking to in a situation like this.  Is it

24  the accuser, is it the fact-finder or is it the judge?  I

25  would like to choose, at least at the outset, to engage

```
 1    with your Honor as accuser, because that is part of the

 2    process, and to segue later into discussing law and facts

 3    with you as fact-finder and as judge.

 4        Judge, again, I'm very worried that, as accuser, the

 5    expressed ire here today at me personally, that this is

 6    taking over a little bit.  I don't mean to be

 7    disrespectful to you as a judge; I just have a concern.  I

 8    apologize for what I have done here today.  I am

 9    optimistic and hopeful it doesn't lead to any adverse

10    inferences that the court might draw -- or that the court

11    as a fact-finder might draw later.  But I am concerned,

12    because the court has previously expressed on the record

13    some degree of ire.

14        I am concerned also that there are some terms being

15    used here by class counsel, by the defense, and apparently

16    adopted by the court as part of the narrative that class

17    counsel got before the court first.  One of the terms is

18    "professional objector."  I am concerned that that could

19    be unfairly used as a pejorative substitute for evidence

20    and proof.  Other district courts, with all due respect,

21    have concluded that representation by an attorney of

22    objectors has no greater bearing on the merits of the

23    objection raised than the plaintiff's counsel's experience

24    in filing class actions speaks to the merits of the claims

25    made in that context.
```

1    I am also concerned about some preliminary views of

2    the evidence, and whether they continue to obtain --

3    whether they continue to obtain, in the face of additional

4    evidence that we have submitted here in writing --  In

5    denying -- in the order denying the motion to vacate,

6    which is at Docket 156, at Page 4, note 1, there was a

7    negative comment in that footnote about Mr. Bandas'

8    argument that it took time to arrange for the transfer of

9    the full amount of the bond.  The quote from the order is,

10   "Objector's decision to post $2,000 in direct

11   contravention of the court's order belies this argument."

12        THE COURT:  Mr. Iaria, let me help you and see if

13   we can simplify this.  It was my experience in private

14   practice that when I needed to post bond, let's assume

15   that it was a $10,000 bond, I went to a company that

16   issued bonds, and I didn't give them $10,000, I paid a

17   fee, and they issued the bond.  Now, I'm not sure what

18   that fee is these days, but the argument that it would

19   take me a long time to find $41,000 is not one that

20   resonated with the court.  That's what that footnote is

21   attempting to explain to counsel.

22        MR. IARIA:  Well, I did discuss that with

23   Mr. Bandas, and he indicates that is not part of his

24   practice, not part of his procedure, and he was not aware

25   of bonding companies that would do that in this case, or

1    this type of case.  He and Ms. Petrus, his bookkeeper, do

2    aver that she was on vacation for the period of time from

3    before the court's five-day order ran out, up until the

4    day the check was written to post the full amount of the

5    bond.  When she came back, the check was written.  She was

6    the one responsible for doing that in the office.  It is

7    not a large firm, and they are not people who have

8    substitute responsibilities to take over in the absence of

9    somebody like Ms. Petrus.

10          THE COURT:  Let's try and get a chronology so that

11   it is clear.  What is the date of the order of this court

12   that says post a bond in the amount of $41,000?

13          MR. IARIA:  It was July 9th, I believe.

14          THE COURT:  And what is the sequence in the order

15   that specifies a period of time?

16          MR. IARIA:  Five days.

17          THE COURT:  That means we need to get a bond by

18   July 13th.

19          MR. IARIA:  Correct.

20          THE COURT:  The argument that was made by

21   Mr. Bandas at the time was that he disagreed with the bond

22   amount that I set, and he had a good faith belief that I

23   was charging the wrong amount of damages in order to be

24   bonded against, and, therefore, he would tender a check

25   for $2,000.  Is that a correct recitation?

1          MR. IARIA:  Yes.

2          THE COURT:  Now, give me the timeframe for the

3     bookkeeper's vacation.

4          MR. IARIA:  She was on vacation from July 13th

5     through July 21st.

6          THE COURT:  So if we have five days from when I

7     issued my order --

8          MR. IARIA:  Would be July 14th.

9          THE COURT:  We have four of those five days the

10    bookkeeper is there, can write a check, apparently does

11    write a check at some point for $2,000.  And now I have

12    read Ms. Petrus' declaration that says, I was camping;

13    gosh, I wasn't bothered by my boss, and that's why this

14    whole problem was created.  Do you subscribe to that

15    theory?

16          MR. IARIA:  She doesn't say that's why this whole

17    problem was created.  She says she was unavailable to

18    write the check.

19          THE COURT:  She was available for four days,

20    wasn't she?

21          MR. IARIA:  She was.  And during that time period

22    there was still motions pending dealing with vacating the

23    court's order.  There was still a motion in the Ninth

24    Circuit, an emergency motion for a stay, that hadn't been

25    decided.  Mr. Bandas, as he points out in his declaration,

1    was waiting to see what happened on that.  And, yes, a

2    check could have been written, but as the court knows from

3    its review of the case law that deals with the inherent

4    sanction authority of the court, the court has to find by

5    clear and convincing evidence that this was an act of bad

6    faith.  And I don't believe it does that.

7              THE COURT:  You keep switching to that gear every

8    chance you get.  Let's stay on my question, which is, what

9    I have is a clear order of this court that says post a

10   bond in a certain amount.  Do you believe that taking an

11   appeal to the Ninth Circuit suspends my order?

12             MR. IARIA:  It doesn't suspend it, your Honor.

13             THE COURT:  We are all here in beautiful Puget

14   Sound.  The boat is here.  I order the boat is free to

15   leave.  No bond is posted and the ship sails.  In the

16   meantime people say, well, you know --  All right.  Let's

17   reverse my assumption here.  Let's say I order it

18   detained.  The presence of an appeal to the circuit

19   doesn't suspend the effectiveness of my order.  That's a

20   principle that seemingly is never acknowledged here.

21   Rather, it is, you should examine my good faith in

22   thinking that you've got cloudy judgment and you've got

23   the wrong number.  That, to me, is where we are.  And all

24   the discussion of good faith in the world or bad faith in

25   the world, you know, you don't need bad faith when you

```
 1    have a willful disobedience of a court order.  The fact
 2    that I need to inherently supervise the jurisdiction of
 3    this court, I can't tolerate people going:  Judge, I just
 4    disagree with you, so I'm not going to do it.  Which is
 5    where Mr. Bandas and I were.
 6           MR. IARIA:  I don't believe he said, I disagree
 7    with you; I am not going to do it.  I believe, and he has
 8    sworn in his declaration, that he had the intent to do it.
 9    The five days was difficult.
10        The court may be coming at this from a different law
11    firm perspective from its past than Mr. Bandas' practice
12    currently.  It was not an easy thing to come up with that
13    amount of money.  He is in a --  His business situation in
14    that law firm is vastly different than, for example, a
15    large firm where there are many, many staff, many
16    employees who can handle things like this.
17        Again, you're right, the full bond amount was not
18    posted.  That violates the court's order.  The question
19    is, what sort of sanctions?  Does that establish bad faith
20    so that the court can sanction under its inherent
21    authority, or is some other type of sanction, remedial in
22    nature, appropriate?
23           THE COURT:  I must say, you cite one case for this
24    proposition, and that's the -- one lead case for this
25    proposition, and that's the Fink versus Gomez case,
```

1    decided by, I believe it was, Judge McKeown in 2001.  In

2    it, on page --  I can't cite by headnotes anymore.  The

3    cite for that is 239 F.3d 989.  Under the analysis section

4    it says, "The Supreme Court in Roadway Express versus

5    Piper delivered the definitive summary of the basis on

6    which a federal court may levy sanctions under its

7    inherent power."  "The court," referring to the district

8    court, "reiterated the federal court's inherent power to

9    levy sanctions, including attorney's fees for," quote,

10   "willful disobedience of a court order," followed by three

11   ellipses, "or, as an alternative, when the losing party

12   has acted in bad faith, vexatiously, wantonly, or for

13   oppressive reasons."  Then it says a little bit later on

14   that, "The Supreme Court reaffirmed the Roadway principles

15   in Chambers," 501 U.S. 32, 1991.

16      Would you agree with me that the court sets out two

17   tests then for inherent authority, willful disobedience

18   being one and bad faith being the other?

19           MR. IARIA:  I believe other cases discuss bad

20   faith in a different context.  In that case, which I

21   believe also acknowledges that there is some confusion and

22   overlap of the use of the term "bad faith," it does say

23   that.  But I believe there are good faith arguments to be

24   made that bad faith is required.

25           THE COURT:  And I agree with you that there is an

1   extended discussion by Judge McKeown, who talks about the

2   Intel case, the Zambrano case, the Keegan case and the

3   Barber case.  And when there is a discussion about the

4   Barber case, it is talking about the question of bad

5   faith.  In talking about bad faith it has some language

6   which says that the contests between intentional --  Let

7   me start again.  There is a difference between intentional

8   disregard of a court order and bad faith.

9       I don't know how we can have the Supreme Court saying

10  we've got two bases, one is willful disregard of an order,

11  and the second is bad faith; and the circuit then saying

12  bad faith is required for willful disobedience.  So I

13  don't think I agree with your analysis of those cases,

14  although I certainly agree with you that the language in

15  these things is a hopeless muddle, as is frequently the

16  gift given us by the circuit.

17          MR. IARIA:  And other courts as well, no question.

18  Your Honor, I do believe that an argument can be made that

19  bad faith is required, and even willfulness is a

20  heightened standard beyond mere neglect.  There is no

21  question about that.

22      Let's assume for the sake of argument that willfulness

23  exists here, which I don't concede, but let's assume that

24  this was willful, in the sense of being defiant of the

25  court for no good reason, which is how I would like to

1  interpret it.  We have a period of time here of just a few

2  days.  What would the attorneys' fees be for failure to

3  post the full amount of the bond during that timeframe.

4      THE COURT:  I don't intend to impose attorneys'

5  fees.  I intend to impose, if I am persuaded, one, a

6  revocation of Mr. Bandas' pro hac vice status in the

7  Western District of Washington, something that you discuss

8  in your memorandum at length, saying, Judge, you don't

9  have any authority to go anywhere else.  I agree that I

10  don't have any authority to tell --  Mr. Bandas, you are

11  in the Eastern District of Texas?

12      MR. BANDAS:  Southern District of Texas, your

13  Honor.

14      THE COURT:  I can't tell the Southern District of

15  Texas to punch Mr. Bandas' ticket.  That is not my

16  authority.  I do have the authority, and the supervision

17  of the lawyers who practice before me, to revoke a pro hac

18  vice status in the Western District of Washington.

19      The second thing that I have is an ability to

20  sanction.  Sanctions are different than attorneys' fees,

21  although, once again, under those Ninth Circuit cases they

22  sometimes all get lumped together.

23      Addressing your last point, I don't need to go any

24  farther than Mr. Bandas's memorandum in opposition to

25  sanctions -- I'm going to look, but it is signed by you,

1   where it says, "The full bond amount was not timely

2   posted."  And Mr. Bandas agrees that this violated the

3   court's order.  So I think we have established that we

4   have a violation of the court order.

5        Consequently, I am not sure --  I mean, there are a

6   lot of papers talking about bad faith.  I'm not sure what

7   that really is all about.  You also have some footnotes in

8   there about criminal contempt that I am still waiting to

9   understand the relevance of.  I am not here on criminal

10  contempt.  I am here under my inherent power to supervise

11  the jurisdiction before me.  I have a straight act of

12  disobedience of a court order, for which I am now

13  presented with a couple of explanations, one of which was:

14  Well, Judge, you were wrong, and so we didn't do it; and,

15  my bookkeeper was on vacation, and so I didn't do it.  All

16  I know is, in what seemed to me to be a pretty clear case,

17  that was the result of several weeks' worth of to-ing and

18  fro-ing between class counsel and defense counsel and the

19  objector's counsel, an order of this court issued saying

20  post this amount.  And it didn't happen.  Why is this more

21  complex than that?

22        MR. IARIA:  First of all, if the court is saying

23  in its comments about criminal contempt that it is not

24  interested in or will not impose punitive sanctions, such

25  as a punitive fine unrelated to compensatory or remedial

1    costs, then we don't need to get into that farther.

2        I do believe in good faith that it is the nature of

3    the sanctions that determines the process that is due.

4    There is a separate and different process that is due

5    under the rules for punitive sanctions.  Calling them

6    sanctions doesn't change the nature of whether it is

7    punishment or not.  If we are not going there, then we

8    don't need to resolve that good faith difference that we

9    have here.

10            THE COURT:  Then let's get you on the record.  If

11   I am looking at revoking pro hac vice status, is that a

12   punitive sanction?

13            MR. IARIA:  I believe it could be.  I believe an

14   argument could be made to that extent.

15            THE COURT:  Would you like to make it now?

16            MR. IARIA:  It doesn't seem to have any remedial

17   purpose, and it is not compensatory, so that leaves

18   punitive.

19            THE COURT:  All right.  Is it your position then

20   that would require a finding of bad faith?

21            MR. IARIA:  Yes.

22            THE COURT:  So your position is that a flat-out

23   disobeyance of a court order is not grounds for removing a

24   pro hac vice admission?

25            MR. IARIA:  Your Honor, first of all, I don't

1  believe there was a flat-out disobedience of the court's

2  order.

3          THE COURT:  Help me with that one.  Did it happen

4  or did it not?

5          MR. IARIA:  It happened.  But there was a

6  procedure that Mr. Bandas followed that he believed in

7  good faith allowed him to do this.  There was a dispute,

8  obviously, about the nature of the administration costs

9  and whether they concluded in a Rule 7 bond.  In the

10  Navistar Diesel case another district court judge has

11  agreed with that position, that they shouldn't be included

12  in the Rule 7 bond.  At some point you get to a bond that

13  is so high that it actually deprives a litigant of a right

14  to appeal.  This is not a small bond that was imposed.  It

15  was imposed, it was required to be posted in a very quick

16  way, and Mr. Bandas did everything that he could to

17  challenge it, and had the intent to post it, and

18  ultimately did post it.  I don't consider that to be a

19  willful flouting of the court's authority.  I believe it

20  was a good faith challenge to what the court had ordered.

21          THE COURT:  Do you think that is how this system

22  operates, that Mr. Bandas or you can say, Judge, we just

23  don't agree with your order and so we are not going to

24  obey it?  You want $41,000, we think the proper amount is

25  $3,000, so we are going to send you a check for $3,000.

1      By the way, we are going to appeal it to the circuit, and

2      so in the meantime, get over it.  Is that your concept of

3      the judicial system?

4              MR. IARIA:  It is not, your Honor.  I don't

5      believe that is what Mr. Bandas said or implied or

6      intended in any of his actions.  I believe, again, that he

7      challenged the order in good faith and did everything he

8      could in aggressive litigation to get it overturned, and

9      had the intent to pay it upon getting decisions, at least

10     at this stage of the proceedings -- not that he was wrong,

11     but he wasn't going to be listened to at this stage of the

12     proceedings.  The Ninth Circuit and the court turned down

13     his motion to stay.  I believe that was good, aggressive

14     litigation, and he pushed it as far as he could.

15        Where he failed was in not having the full amount

16     ready to go.  I ask myself, is that a sanction that -- is

17     that a violation of a court order that requires a fairly

18     dramatic sanction, you can't practice here anymore pro hac

19     vice?  That's --

20             THE COURT:  Well, do you think --  I'm sorry.  I

21     cut you off again.

22             MR. IARIA:  I think that is a fairly substantial

23     sanction that is not warranted by the facts, even as the

24     court interprets them.

25             THE COURT:  So your view is that it is okay for

 1   lawyers that practice in the Western District of

 2   Washington to not follow direct orders of the court

 3   because they disagree with them and say, I'm not posting a

 4   bond because I disagree with the terms of your order, but

 5   I am appealing to the circuit, and so that's okay?

 6      This seems to me the fundamental point of difference

 7   for us.  I was trained in the belief that when the court

 8   made an order, it actually had to be obeyed.

 9            MR. IARIA:  It does.  The court has the authority,

10   and the court issued and entered an order, and it does

11   have to be obeyed.  That is not the end of the inquiry, in

12   terms of whether there was bad faith and we are going to

13   get into inherent power sanctions; and, two, what is a

14   sanction commensurate with the misdeed.

15            THE COURT:  All right.  Let's have you finish up

16   your argument here.  You should tell me what you want me

17   to know, because I have asked my questions.

18            MR. IARIA:  The court sits ultimately as

19   fact-finder and sentencing judge in this context.  It is

20   clear from the questions that the court is taking a

21   preliminary view of things that is different on some of

22   the inferences to be drawn from the evidence.  Again, I

23   continue to be concerned about some inferences that the

24   court may be drawing or basing things on.  I have

25   discussed some of them at the outset.

1      There is a comment that the court made on the record

2      the last time about the objectors and their relationship

3      with Mr. Bandas, the professional attorney-client

4      relationship.

5          THE COURT:  And I found your submissions on that

6      interesting.  I, frankly --  Mr. Bandas apparently has an

7      agreement with these people that they substituted his

8      judgment for their judgment, which is an interesting

9      approach to the attorney-client relationship.  That's when

10     your three adversaries sitting there, all I'm sure

11     enjoying this process, asked these people, "Did you read

12     this?"  And they say, "No."  "Well, do you agree with it?"

13     "Well, I don't know."  "Did you consult with your lawyer

14     about it?"  "No."  That's the record that comes back to

15     me.  That doesn't sound --  I understand the attorney is

16     going to be better informed; he is going to have a broader

17     understanding of the law, but I think there is some need

18     to consult with your client to say, "This is what I

19     recommend.  Do you agree?  Am I authorized?  That

20     apparently, if I take your briefing on this subject, was

21     initiated by Mr. Bandas' agreement.  I think that is

22     interesting, but I don't think it has anything to do with

23     what we are talking about.

24         MR. IARIA:  I can leave it behind as one of those

25     interesting things we discussed, and that is not relevant

1    I am assuming, to the court's decision, ultimately?

2              THE COURT:  I have told you what is relevant.  It

3    is a very simple set of a facts.  It is the fact that I

4    order something, it doesn't happen.

5       It is almost sort of a partial compliance, but it is a

6    substitution of somebody else's judgment for my order.

7    And that, to me, is not going to be able to be tolerated

8    in the context of trying to administer large class actions

9    or the smallest dog bite case that comes in here.

10      When the court speaks, the remedy if you don't like

11   what I say is to have the people who grade my homework

12   tell me I'm wrong, which sometimes they do and sometimes

13   they don't.  In the meantime, you don't suspend the

14   operation of the order because you disagree with it.

15             MR. IARIA:  Again, I can point to the Azizian

16   case.  I know we have an agreement to disagree about our

17   interpretation of that and what it means.  I believe that

18   it does set forth some steps.  It is not necessarily a

19   holding that I am suggesting Azizian stands for.  But

20   there was a particular result in that case that is

21   consistent with Mr. Bandas's use of that case, and his

22   hope for what the outcome of the court's bond would be.

23   In Azizian, the sanction was the dismissal of the appeal.

24   The Ninth Circuit decided that was too severe a price to

25   pay, given the steps that the litigant had followed in

1   that case, which were precisely what Mr. Bandas followed

2   in this case.  It negates bad faith, I believe it negates

3   willfulness as well, and certainly mitigates any sanction

4   that the court would be interested in imposing.

5         THE COURT:  How could it eliminate willfulness?  I

6   mean, "willfulness" in this context is compliance with the

7   order/noncompliance with the order.

8         MR. IARIA:  I guess I view willfulness differently

9   than that, that it is a flouting of the court's authority

10   for other purposes.

11         THE COURT:  That, to me, would start to get into

12   the Ninth Circuit's distinctions between negligence,

13   recklessness and intentional conduct.  And by "intentional

14   conduct," I mean what you use as bad faith, evil motive in

15   the heart.  None of that, to me, has anything to do with

16   the question of did I intend to pay this, but, you know,

17   my secretary got in an accident on the way to the post

18   office and the check didn't get sent.  That wouldn't be

19   willfulness to me.  When you have made the decision, and

20   in fact confirmed by the fact that you send the check for

21   $2,000 because you think that looks better than 41, that's

22   willfulness to me, counsel.

23         MR. IARIA:  I came in here today not prepared to

24   present evidence because of the way I read the court's

25   order.  I did not come in here to pull the wool over the

1    court's eyes with that.  I hate to think that if I were

2    appearing pro hac vice I could be barred from forever

3    practicing in this district for my mistake here today.  I

4    violated the court's order, the way the court is

5    describing Mr. Bandas's disobedience of the court's order.

6    The court got pretty angry with me and accused me of

7    things that I am telling you, again, I did not do.  I

8    really hate to think that I could be barred from

9    practicing before the court for what I did.

10       It seems to me, under the court's interpretation of

11   its authority, that there is no order that could not be

12   violated without being subject to what I think is a fairly

13   Draconian sanction, a professional stain of not being able

14   to practice in a particular district.  I respectfully

15   disagree with what the court is proposing as a sanction.

16   Thank you.

17           THE COURT:  All right.  We have spent 50 minutes

18   discussing this matter.  Mr. Bandas, I am going to do

19   something unusual, because you are represented by counsel.

20   But it is you that ultimately is the subject of this.  Do

21   you have anything you wish to add, sir?

22           MR. BANDAS:  Simply, your Honor, I am embarrassed

23   that it has come to this.  My apologies to the court for

24   what I think the court has perceived as intentional

25   disrespect.  I did not intend that, your Honor.

 1          THE COURT:  I don't consider it intentional

 2    disrespect, I consider it intentional noncompliance.  You

 3    are sitting where a lot of defendants sit in this

 4    courtroom.  Disrespect is something that periodically they

 5    manifest in hand gestures or an analysis of the state of

 6    my parent's marriage when I was conceived.  You and I

 7    simply don't agree on the fact --  I mean, you're welcome

 8    to challenge the bond amount.  That is something that is

 9    totally fine.  But there is a way to do that.  In my view,

10    you didn't do it.  That's what our disagreement is.

11          MR. BANDAS:  I understand, your Honor.  I am

12    feeling the energy of the defendants here.

13          THE COURT:  That's bad, because I think we had a

14    child pornographer and I think we had bank robbers this

15    week.  You are several classes up from that.

16          MR. BANDAS:  Thank you, your Honor.  I will sit

17    down and be quiet.

18          THE COURT:  I think the facts in this matter are

19    clearly stated.  The court entered an order, it wasn't

20    complied with.  It was not complied with, and instead a

21    lesser amount was sent.  Simultaneously, there was an

22    effort to seek some form of appellate review.

23        To the court, the rules are clear, that you can't

24    substitute your judgment, regardless of the extent of your

25    good faith, for a direct order of the court.  I find that

1  conduct to be clear and convincing evidence.  I do so

2  because there is really no disagreement about it.

3  Mr. Iaria, in his briefing, concedes the full bond amount

4  was not timely posted, and Mr. Bandas agrees that this

5  violated the court's order.

6     The larger context of this has to do with a

7  substitution of a party's belief as to the appropriate way

8  to proceed for that of the court.  Contrary to the

9  briefing submitted and the declarations submitted, I don't

10  think they are persuasive in this case, because they all

11  focus on the belief that there has to be bad faith shown

12  in connection with a willful disobedience of a court

13  order.

14     I am in sympathy with the fact that Mr. Iaria has to

15  battle the court, the other party in this particular

16  motion.  I also am feeling somewhat hamstrung, in that I

17  can't argue equally because of my role as both the

18  fact-finder and the ultimate decision-maker.  But I

19  believe that the proper interpretation of the law is that

20  the court can sanction if a party acts in bad faith,

21  vexatiously, wantonly, or for oppressive reasons; or, the

22  second test, that the party willfully disobeys a court

23  order.  I disagree with Mr. Iaria that that is available

24  in every case.  I think there is a rule of reason.  If I

25  could get rid of every lawyer who violated one of the

1    local rules, usually on filing, there would be very few

2    lawyers left.

3        But the decisions that I would look to would include

4    the Aloe Vera decision, 376 F.3d Ninth Circuit 2004, and

5    the much discussed Fink versus Gomez case, where I think

6    the court falls into the trap of using the two words "bad

7    faith" in at least two or three different meanings.

8        As I have indicated, I do find, under a clear and

9    convincing evidence standard, there was disobeyance with

10   the court's order.

11       I have attempted to be mindful of the opportunity to

12   provide Mr. Bandas with a full opportunity to respond, one

13   that he more than amply took advantage of.  I think that I

14   understand the full record, and I understand the point of

15   view that is found in my understanding of the court's

16   inherent authority to enforce the rules of the Western

17   District of Washington, and, simply, the court's inherent

18   authority to supervise the litigation that is before it.

19       The question then, having made that finding, is, what

20   is the sanction that is appropriate?  In this instance, I

21   believe that the sanction is to at this time revoke

22   Mr. Bandas' authorization to practice in the Western

23   District of Washington.  That's, frankly, without a lot of

24   significance, as this case is largely over.

25       As I have attempted to say now on two or three

1    occasions, so that there was no misunderstanding, I can't

2    tell any other district or any other circuit, or any

3    circuit, what it should do.  But I do find that conduct in

4    relation to a case here requires that remedial action.

5        I have thought long and hard about the question of if

6    I want to impose financial sanctions.  My conclusion is

7    that Mr. Bandas has been forced to give up portions of his

8    time in order to come to Seattle and participate in these

9    proceedings, and has also incurred the expense of hiring

10   counsel, and paying expenses for his own trips up here.

11   Given that situation, I don't believe that a further

12   monetary sanction is necessary or appropriate.

13       Therefore, the ruling of this court is that, in

14   regards to the appropriate sanction, it will be to revoke

15   Mr. Bandas' permission to practice pro hac vice in the

16   Western District of Washington.

17       I believe that there are two motions pending.  One is

18   the request to withdraw as local counsel, which I will

19   grant.  I believe there is also one other motion that has

20   to do with participation as counsel.  I didn't bring my

21   motion report out here, but when the minutes come out, I

22   will clean up any remaining housekeeping matters.

23       Mr. Iaria, anything further on behalf of Mr. Bandas.

24           MR. IARIA:  No, your Honor.

25           THE COURT:  Can you think of any other pending

1    motions?  Mr. Bandas?

2            MR. BANDAS:  No, your Honor.

3            THE COURT:  Do any of the plaintiff class or

4    defense counsel have anything further, in terms of

5    procedural matters in this proceeding?

6            MR. CANTOR:  No, your Honor.

7            MR. LUNA:  No, your Honor.

8            MR. RUMMAGE:  No, your Honor.

9            THE COURT:  I think we have wrapped this one up,

10   and court will be in recess.

11                      (Adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4

5

6

7

8

9          I, Barry L. Fanning, Official Court Reporter, do hereby
   certify that the foregoing transcript is true and correct.

10

11                              S/Barry L. Fanning

12                              _____

13                              Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25